**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christie's Cabaret of Glendale LLC, et al., | No. CV-19-04444-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| United National Insurance Company, et al., | |
| Defendants. | |

Before the Court is Defendant United National Insurance Company's ("UNIC") Motion for Summary Judgment (Doc. 88). The Court rules as follows.

**I.      BACKGROUND**

Plaintiff Christie's Cabaret of Glendale, LLC ("Christie's") is a gentleman's club located in Glendale, Arizona. (Doc. 88 at 3.) UNIC issued a commercial property insurance policy (the "Policy") covering Christie's property from February 21, 2015, to February 21, 2016. (Docs. 88 at 9; 93 at 3.) The Policy contains a vacancy provision, which provides that UNIC will not pay for any loss or damage caused by vandalism, building glass breakage, theft, or attempted theft if the building was "vacant for more than 60 consecutive days before that loss or damage occurs." (Doc. 88-1 at 32.) Under the Policy, a building is considered vacant if 70 percent or more of its square footage is not rented or used to conduct customary operations. (*Id.*) But a building is not considered vacant if it is under construction or renovation. (*Id.*) In the event of loss or damage to the property, the Policy required Christie's to send UNIC a signed, sworn proof of loss containing information to

investigate a claim. (*Id.* at 31.) The Policy also required Christie's to cooperate with UNIC in the investigation or settlement of any claim and allowed UNIC to examine a Christie's representative under oath. (*Id.*) The Policy further provided that coverage would be void if Christie's intentionally concealed or misrepresented a material fact concerning the covered property or a claim under the Policy. (*Id.* at 36.) Finally, the Policy provided that Christie's could not bring a legal action against UNIC unless it fully complied with all the terms of the Policy and the action was brought within two years of the date on which the loss or damage occurred. (*Id.*)

Christie's ceased conducting normal operations at the property on July 25, 2015, in order to perform renovations. (Docs. 88-18 at 8; 88-51 at 8.) Thereafter, Christie's encircled the property with a fence, secured the front door with a deadbolt, and welded other doors shut. (Doc. 88-18 at 9–10.) Christie's also moved some chairs located in the club to a storage unit located on the property, moved alcohol from the club to a separate building on the same property, and began receiving bids from subcontractors. (Doc. 88-51 at 17, 57.) Christie's president testified that sometime between July and October 2015, an elevator shaft located in the building was removed. (*Id.* at 13–14.) During that same period, Christie's performed landscaping work on the property. (Doc. 93-4 at 1–2.) Christie's head of construction would also visit the property a few times a week to ensure that there were no water leaks and that no one had broken in. (Doc. 88-51 at 58.)

The planned renovations at Christie's included demolishing the club's mezzanine and constructing a 7,000 square-foot addition. (Docs. 88-18 at 8; 88-51 at 8, 57.) These planned renovations required Christie's to obtain permits from the City of Glendale. (Doc. 88-51 at 57.) As of December 2015, however, Christie's had not received construction or building permits for the planned renovations. (Doc. 88-62 at 117.) Indeed, Christie's was submitting plans and specifications for the permits as late as December 2016 (Doc. 88-21 at 28), and the designs were being reviewed as late as July 2017. (Doc. 88-61 at 5–9.) Demolition at Christie's did not begin until at least late 2018. (Doc. 88-51 at 65.) As of December 1, 2020, Christie's had not reopened or resumed customary operations. (Doc.

88-51 at 8, 88.)

On October 18, 2015, individuals broke into Christie's and stole property and damaged the interior of the building. (Docs. 88 at 3; 88-3 at 8; 93 at 3.) Christie's submitted a claim for the break-in to UNIC on November 13, 2015. (Doc. 88-17 at 79–80.) UNIC assigned an independent adjustor to investigate and document the break-in. (Docs. 88 at 4; 93 at 3.) The independent adjustor physically inspected Christie's on November 25, 2015. (Doc. 88-10 at 42–45.) The independent adjustor testified that he did not see any demolition, equipment, or anything else that looked like renovation was imminent. (Doc. 88-62 at 19.) Christie's president and head of construction both testified that no demolition or construction had begun as of the break-in. (Docs. 88-51 at 21–22, 59.) After the break-in, Christie's reinforced the fencing around the property, welded shut all exterior doors, and installed a chain and deadbolt on the front door. (*Id.* at 60.) The head of construction continued to visit Christie's a couple of times a week to check on the property. (*Id.*)

On December 4, 2015, individuals broke into Christie's again, stealing property and causing additional damage to the building. (Docs. 88 at 4; 88-3 at 16; 93 at 6.) After this second break-in, the head of construction again welded everything back shut. (Doc. 88-51 at 62.) Individuals broke into Christie's a third time on December 7, 2015, stealing additional property and causing further damage. (Docs. 88 at 4; 88-3 at 19; 93 at 3.) After the third break-in the head of construction welded all the exterior doors shut again. (Doc. 88-51 at 62–63.) The independent adjustor informed UNIC of the second and third break-ins on December 21, 2015. (Doc. 88-10 at 14.)

On February 9, 2016, UNIC sent Christie's a check for $16,389.56. (Docs. 88-9 at 28; 88-62 at 75, 111.) The check did not explain what it covered or whether it rendered in partial or total settlement of Christie's claim. (Docs. 88-9 at 28; 88-62 at 21; 93 at 15.) Christie's requested clarification regarding the check on multiple occasions. (Docs. 88-4 at 49; 88-9 at 26; 93-15 at 2.) UNIC did not respond and, accordingly, Christie's chose not to deposit the check. (Docs. 88 at 5; 93 at 15.) The check eventually escheated to the State of Tennessee. (Doc. 88-16 at 23.)

On March 22, 2016, Christie's sent UNIC a letter containing a repair estimate totaling $215,722.76. (Doc. 88-9 at 26.) The letter did not apportion the estimated damages by date of loss. (Docs. 88 at 5; 88-9 at 26.) The letter also indicated that Christie's had not been open since July 2015. (*Id.*) On April 18, 2016, UNIC requested that Christie's breakdown the claimed damages by date of loss. (Docs. 93 at 13; 93-13 at 11.) UNIC also requested that Christie's provide the specific dates of loss and police report numbers. (Docs. 88 at 7; 93 at 13.) Christie's did not respond to these requests, as it believed that UNIC already possessed the information needed to resolve Christie's claims. (Docs. 88 at 7; 93 at 13.)

On February 15, 2017, UNIC sent Christie's a letter explaining that they had not received the requested information. (Docs. 88 at 7; 88-4 at 41.) UNIC reminded Christie's of the Policy's requirement that they submit a sworn proof of loss containing information requested to investigate the claims within 60 days of the request and to otherwise cooperate in the investigation of the claim. (Doc. 88-4 at 41–42.) UNIC requested that Christie's submit a proof of loss. (*Id.*)

UNIC sent Christie's monthly follow-up letters from April to June of 2017, informing Christie's that it had not received the requested proof of loss or any other response. (Doc. 88 at 7.) On September 5, 2017, UNIC sent Christie's another letter. (Doc. 88-2 at 27.) The letter explained that UNIC had not heard anything from Christie's in almost six months. (*Id.*) UNIC again requested that Christie's submit a proof of loss. (*Id.*) UNIC also indicated that it may be interested in having a Christie's representative sit for an examination under oath ("EUO"). (*Id.*)

Christie's sent proofs of loss and a breakdown of damages to UNIC many months later, on May 1, 2018. (Doc. 88-1 at 172.) The proofs of loss indicated that there were only two break-ins: October 18 and December 4, 2015. (Docs. 88 at 8; 88-1 at 174, 177.) They also stated that the property had not undergone any change of occupancy, use, or exposure since the Policy was issued. (*Id.*) UNIC did not respond to Christie's letter. On March 5, 2019, Christie's sent UNIC a letter inquiring about the status of the claim in light of the

1 proofs of loss. (Docs. 88 at 8; 88-2 at 26.) UNIC responded that it had never received
2 Christie's May 1, 2018, letter. (Docs. 88 at 8; 88-1 at 169.) Christie's resent the proofs of
3 loss and, on April 11, 2019, UNIC rejected them. (Doc. 88-1 at 158, 169.)

4 Meanwhile, Christie's initiated this action against UNIC in Arizona Superior Court
5 on February 14, 2019, claiming breach of contract and bad faith. (Doc. 1-1 at 5–10.) UNIC
6 removed the case to this Court on June 11, 2019. (Doc. 1.) On March 29, 2021, UNIC filed
7 the instant motion for summary judgment. (Doc. 88.) It argues that the vacancy provision
8 excludes Christie's claims from coverage under the Policy. (*Id.* at 2.) It also argues that
9 Christie's claims are excluded from coverage because Christie's breached several Policy
10 conditions. (*Id.*) Finally, UNIC argues that summary judgment is warranted as to Christie's
11 bad faith claim because Christie's materially impeded UNIC's investigation. (*Id.*)
12 Christie's, on the other hand, argues that the vacancy exclusion does not apply because the
13 property was "under renovation." (Doc. 93 at 2.) Christie's further argues that UNIC
14 waived its right to assert the vacancy provision by failing to raise it until this litigation.
15 (*Id.*) Christie's also asserts that it did not breach Policy conditions and that, even if it did,
16 UNIC did not suffer substantial prejudice as a result. (*Id.* at 17 n.4.) Finally, Christie's
17 argues UNIC's actions in investigating the claim were unreasonable and inadequate. (*Id.*)

18 **II. LEGAL STANDARD**

19 Summary judgment is appropriate if the evidence, viewed in the light most favorable
20 to the nonmoving party, demonstrates "that there is no genuine dispute as to any material
21 fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A
22 genuine issue of material fact exists if "the evidence is such that a reasonable jury could
23 return a verdict for the nonmoving party," and material facts are those "that might affect
24 the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477
25 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant
26 is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255;
27 *see also Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) ("The
28 court must not weigh the evidence or determine the truth of the matters asserted but only

determine whether there is a genuine issue for trial.").

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment must "cit[e] to particular parts of materials in the record" establishing a genuine dispute or "show[] that the materials cited do not establish the absence of . . . a genuine dispute." Fed. R. Civ. P. 56(c)(1). This Court has no independent duty "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted).

## III. DISCUSSION

### A. Breach of Contract

#### 1. Vacancy Provision

The Policy UNIC issued to Christie's contains a vacancy provision. (Doc. 88–1 at 32.) The provision excludes coverage for loss or damage caused by vandalism, glass breakage, theft, or attempted theft, if the building was "vacant for more than 60 consecutive days before that loss or damage occurs." (Doc. 88-1 at 32.) Under the terms of the Policy, a building is considered "vacant" if 70 percent or more of its square footage is not being rented or used to conduct customary operations. (*Id.*) A building is not considered vacant, however, if it is "under construction or renovation." (*Id.*) The parties' dispute centers on this construction-or-renovation exception.

Vacancy exclusions are common in commercial insurance policies. The exclusion exists to protect the insurer against the increased risk of loss that accompanies a property being unoccupied for an extended period of time. *See TRB Investments, Inc. v. Fireman's Fund Ins. Co.*, 145 P.3d 472, 478 (2006). This is why the provision excludes coverage only for losses caused by certain events that are more likely to occur during a period of extended vacancy, such as vandalism or theft. (Doc. 88-1 at 32.) The construction-or-renovation exception, on the other hand, reflects to the common-sense notion that when a building is

under construction or renovation, rather than truly vacant, "the risk of loss becomes roughly equivalent to that of an occupied building, thus giving the insurer the benefit of its prior risk assessment." *TRB Investments*, 145 P.3d at 478.

UNIC contends that the vacancy provision entitles it to summary judgment on Christie's breach of contract claim because "beginning on July 25, 2015, and continuing through at least December 7, 2015, Christie's Cabaret was 'vacant' as defined by the policy." (Doc. 88 at 11.) Christie's does not dispute that it ceased conducting customary operations at its club more than 60 days prior to the break-ins. (Doc. 93 at 6.) Instead, it argues that the vacancy provision does not bar coverage because the club was "under renovation" at the time of the break-ins. (*Id.* at 3–7.)

The parties disagree over the proper test the Court should apply to determine whether Christie's activities come within the scope of the construction-or-renovation exception. UNIC urges the Court to take as its guide *In re Tom Dubielak v. Travelers Property Casualty Co. of America*, a case decided in 2011 by this Court. No. CV 10-270-TUC-RCC, 2011 WL 13118035 (D. Ariz. Aug. 5, 2011). In that case, the insured leased the covered property to a nonprofit. *Id.* at *1. The property was subsequently broken into. *Id.* The central issue, as in this case, was whether the property was "under construction or renovation" at the time of the break-in. *Id.* at *2. In holding that it was not, the Court determined that the "substantial continuing activities" test, adopted by a number of courts, supplied the appropriate framework by which to judge whether a particular claim comes within the construction-or-renovation exception. *Id.* at *3. That test "requires that 'substantial continuing activities [occur] on, rather than off, the property,'" *id.* at *3 (quoting *Will Realty Corp. v. Transp. Ins. Co.*, 492 N.E.2d 372, 373 (Mass. App. Ct. 1986)), and holds that "'sporadic entry' is insufficient for a finding that substantial continuing activities occurred on the property." *Id.* Applying the test, the Court concluded that cleaning the property, having an architect draw up plans for the intended improvements, meeting with zoning officials, and obtaining subcontractor bids, did not suffice to render the property under construction or renovation. *Id.* at *2–3. In its view,

such acts "constitute[d] nothing more tha[n] preparation for future construction or renovation." *Id.* at \*3.

Christie's, on the other hand, would have the Court follow the approach taken by the Arizona Court of Appeals in *Glasser v. M&O Agencies, Inc.*, No. 1 CA–CV 14–0708, 2015 WL 9096764 (Ariz. Ct. App. Dec. 15, 2015) (mem. decision). In *Glasser*, the insured purchased a former automobile dealership and added it as a scheduled location on his commercial insurance policy. *Id.* at \*1, ¶¶ 2–3. Soon after, however, property coverage for the building was terminated pursuant to the direction of the insured's agent. *Id.* ¶ 3. Several months after coverage was terminated, the insured discovered theft and vandalism at the property and submitted a claim to the insurer. *Id.* ¶ 4. The insurer denied the claim on two grounds. First, it stated that the building was no longer insured, as coverage had been removed pursuant to the direction of the insured's agent. *Id.* Second, it stated that even if the property had been covered under the policy, the claim was barred from coverage by the policy's vacancy exclusion—a provision substantially identical to the vacancy exclusion at issue in this case. *Id.* The insured then filed suit against its insurance agent, alleging that the agent breached the parties' agreement by failing to obtain appropriate coverage for the building. *Id.* ¶ 5.

The agent moved for summary judgment on the ground that the insured was unable to prove damages because, even had the building been covered under the policy, the vacancy exclusion would have precluded coverage. *Id.* ¶ 6. In response, the insured argued that because the property was "under renovation," it was excepted from the vacancy exclusion and would therefore have been covered under the policy had the agent performed his contractual duties. *Id.* As evidence that the building was under renovation, the insured introduced evidence that its employees had been "re-keying the locks, installing fencing and landscaping, removing shelving, signs, logos, trash, and other debris, testing light fixtures and changing light bulbs, cleaning the carpet and touching up the paint, patching holes in the walls, repairing minor plumbing leaks, and repairing broken doors and windows." *Id.* The agent disagreed that these activities were sufficient to render the

property "under renovation" within the meaning of the policy. In the agent's view, such activities merely "constituted routine maintenance and repair, not renovation." *Id.*

The Superior Court agreed with the agent and entered summary judgment against the insured. *Id.* at *2, ¶ 7. It concluded, as a matter of law, that there was insufficient evidence for a jury to find that the property was "under renovation" within the meaning of the policy. *Id.* The Court of Appeals reversed. After reiterating that it is the policy of Arizona courts to give undefined terms in an insurance policy "their usual and ordinary meaning," the Court of Appeals examined several dictionaries and concluded that "renovate" means: "(1) to make new or like new; to clean up, replace worn and broken parts in, repair, etc.; to restore to good condition; (2) to refresh; to revive" or "(1) [t]o restore to an earlier condition, as by repairing or remodeling[;] (2) [t]o impart new vigor to; revive." *Id.* at *3, ¶¶ 13–14. The court then applied those expansive definitions and concluded that the insured had raised a genuine issue of material fact as to whether its activities at the property in question constituted renovation. *Id.* ¶ 15. It determined that evidence that two of the insured's employees were at the property "every day after the purchase making changes and repairs" was enough to overcome summary judgment: "Although [the agent] contends that these activities were simply routine cleaning and maintenance, a reasonable jury could find that they satisfy the usual and ordinary definition of 'renovation.'" *Id.* The approach employed by Court of Appeals to determine whether the insured's activities came within the scope of the construction-or-renovation exception was thus far less demanding than the one employed in *Dubielak*.

In reaching its decision in *Glasser*, the Court of Appeals expressly rejected the two cases that the *Dubielak* court relied on in deciding to adopt the "substantial continuing activities" test, *Will Realty*, 492 N.E.2d 372, and *TRB*, 145 P.3d 472. *Glasser*, 2015 WL 9096764, at *4, ¶ 16 ("Because none of the insurance policies at issue in those cases involved a 'renovation' exception to a vacancy exclusion, we do not find their reasoning persuasive."). Even had the court been persuaded by the reasoning of *Will Realty* and *TRB*, it "would still determine that a fact question exists regarding whether Glasser's activities

at the property were 'substantial and continuing,'" because "summary judgment is only appropriate when no reasonable finder of fact could agree with the position advanced by the non-moving party." *Id.* Thus, although "the activities at the [insured's] Property might not be what is ordinarily envisioned by the word renovation, there is a question of fact under the Policy." *Id.* So too here. As in *Glasser*, the provision at issue here excepts "renovation" in addition to "construction."[1] And, as in *Glasser*, the Policy does not define what it means for a building to be "under renovation." In such cases, Arizona courts "construe provisions in insurance contracts according to their plain and ordinary meaning." *Sparks v. Republic Nat. Life Ins. Co.*, 132 Ariz. 529, 534 (1982). A reasonable jury could conclude that Christie's activities are encompassed within the ordinary meaning of the term "renovation." Had UNIC "intended that the Policy's renovation exception would apply only to substantial reconstruction activities, rather than minor repairs or cleaning, [it] was free to specify that meaning in the Policy." *Glasser*, 2015 WL 9096764, at *3, ¶ 15.

UNIC contends that the Court should decline to follow the approach taken by the Court of Appeals because *Glasser* "is an unpublished decision that has not been cited by any other court and does not have any precedential authority." (Doc. 94 at 3.) The Court is not persuaded. While UNIC is correct that *Glasser*, as an unpublished memorandum decision, is not precedential, *see* Ariz. Sup. Ct. R. 111(c)(1), it may yet be cited for persuasive value, as here, when it was "issued on or after January 1, 2015; no opinion adequately addresses the issue before the court; and the citation is not to a depublished opinion or a depublished portion of an opinion." *Id.* Moreover, while it is true that a decision of Arizona's intermediate appellate court is merely a non-binding "datum for ascertaining state law" under *Erie* and its progeny,[2] such a decision must nevertheless be

---

[1] Where possible, Arizona courts interpreting the language of contracts should give effect to every provision. An interpretation which renders contractual language surplusage should be avoided where possible. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 158 n.9 (1993).

[2] Where *Erie* requires a federal court sitting in diversity to apply state law on an issue, it obligates the court only to follow the state's positive law and decisions of the state's highest court. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). When these sources are indeterminate, the federal court must make an "*Erie* guess" as to how the state's highest court would resolve the issue. *See Thornell v. Seattle Serv. Bureau, Inc.*, 742 F. App'x 189, 191 (9th Cir. 2018).

given "proper regard" and "is not to be disregarded by a federal court unless it is convinced by persuasive data that the highest court of the state would decide otherwise." *Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967).

The decision in *Dubielak* was handed down before any Arizona court had yet addressed the meaning of the construction-or-renovation exception under state law. Without "the benefit of Arizona appellate authority on [the] issue" (Doc. 93 at 7), the Court was left to rely on the decisions of extraterritorial courts in attempting to determine how the exception would be interpreted under Arizona law. Here, on the other hand, the Court has the benefit of state appellate authority—albeit an unpublished decision—to guide its determination. The Court will not set aside such authority in favor of an earlier, and likewise unpublished, federal decision absent ample reason for doing so.

UNIC also argues that the instant case is materially distinguishable from *Glasser*. (Doc. 94 at 4.) It points specifically to two such distinctions. First, it states that while "the 'renovation' in *Glasser* was continuously underway to the interior of an existing building," Christie's activities here "were ordinary maintenance tasks that did not change or renovate the interior of the club." (*Id.*) The precise distinction UNIC is attempting to highlight is unclear. To the extent it argues that the activities must be *continuous* to constitute construction or renovation, its argument is duplicative of the second distinction it identifies, which is addressed below. To the extent it argues that the changes must affect the building's *interior*, rather its exterior, it is mistaken. The vacancy exclusion blanketly provides that "[b]uildings under construction or renovation are not considered vacant." (Doc. 88-1 at 32.) It makes no distinction between renovation to a building's exterior and its interior.

Second, UNIC argues that this case is distinguishable because the employees in *Glasser* "were 'at the property every day' making 'changes and repairs,'" whereas Christie's "merely mov[ed] . . . chairs out of the property[,] . . . weld[ed] the doors shut, encircl[ed] the building with a fence, and occasionally check[ed] on [the building] to make sure it had not been broken into." (Doc. 94 at 4.) The record suggests, however, that Christie's activities were more extensive than UNIC submits. In addition to the activities

UNIC identifies, there is evidence that Christie's moved alcohol from the club to a separate building, began receiving bids from subcontractors, removed an elevator shaft located in the building, and performed landscaping work at the property. (Docs. 88-51 at 13–14, 17; 93-4 at 1–2.) Christie's ledger also shows expenses post-dating the day it closed its doors for building repairs, a change of locks, fire sprinklers, refrigeration maintenance, and expenses related to preparing and submitting permit applications. (Docs. 88-51 at 12–13; 93-2 at 2; 93-3 at 14.) These activities are analogous to those the Court of Appeals found sufficient to defeat a motion for summary judgment. *See Glasser*, 2015 WL 9096764, at *1, ¶ 6 (listing the insured's activities). On such evidence, a reasonable jury could conclude that Christie's was "under construction or renovation" during the relevant period. Accordingly, the Court concludes that summary judgment on Christie's breach of contract claim is not warranted under the vacancy exclusion.

### 2. Christie's Compliance with Policy Conditions

UNIC also contends that it is entitled to summary judgment on Christie's breach of contract claim because Christie's materially breached several Policy conditions. (Doc. 88 at 12–14.) The Court will consider each provision in turn.

#### a. Proof of Loss

The Policy imposes upon Christie's several duties in the event of loss or damage to covered property. One is the general duty to "[c]ooperate with [UNIC] in the investigation or settlement of the claim." (Doc. 88-1 at 31.) Another, the proof of loss provision, requires Christie's to "[s]end [UNIC] a signed, sworn proof of loss containing the information [UNIC] request[s] to investigate the claim." The provision states that such proof of loss must be sent "within 60 days after [UNIC's] request." (*Id.*) UNIC contends that Christie's breached these provisions by submitting untimely proofs of loss.

On February 15, 2017, UNIC sent Christie's a letter requesting that Christie's "submit a Proof of Loss for each date of loss, complete with a breakdown of damages applying to each claim." (Doc. 88-4 at 41.) Christie's did not do so within the 60-day window set forth in the Policy. Indeed, Christie's did not respond until May 1, 2018—

almost 15 months after UNIC's request. (Doc. 88-1 at 172.) When Christie's finally did respond, it submitted only two statements of loss—one for the break-in that occurred on October 18, 2015, and one for the break-in that occurred on December 4, 2015. (*Id.* at 174, 177.) It did not submit a proof of loss for the break-in that occurred on December 7, 2015. (*Id.* at 172.)

Christie's does not dispute that the statements were untimely. Instead, Christie's argues that summary judgment is unwarranted because UNIC's independent adjustor inspected the property on two separate occasions and submitted detailed reports to UNIC that provided UNIC with the information necessary to apportion damages and determine whether Christie's was vacant. (Doc. 93 at 9, 17 n.4.) Christie's therefore appears to concede that it breached the Policy, but argues that the breach did not prejudice UNIC because UNIC already possessed the information necessary to inform its coverage determination. In Arizona, the insured's breach of a policy condition may constitute a valid defense to an action on the policy only if the insurer is "substantially prejudiced thereby." *Clark Equip. Co. v. Ariz. Prop. & Cas. Ins. Guar. Fund*, 189 Ariz. 433, 441–42 (Ariz. Ct. App. 1997) (citing *Holt v. Utica Mut. Ins. Co.*, 157 Ariz. 477, 481 (1988)). Whether an insurer has suffered substantial prejudice is generally a question for the trier of fact. *Holt*, 157 Ariz. at 484. Here, Christie's has introduced facts suggesting UNIC had enough information to determine Christie's occupancy status and apportion damages by date of loss. A reasonable jury could therefore conclude that UNIC did not suffer substantial prejudice because of Christie's failure to submit timely proofs of loss.

### b. Concealment, Misrepresentation, or Fraud

The Policy also includes a concealment or misrepresentation exclusion. The exclusion reads:

> This Coverage Part is void in any case of fraud by [Christie's] as it relates to this Coverage Part at any time. It is also void if [Christie's] or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:
> 1. This Coverage Part;
> 2. The Covered Property;
> 3. Your interest in the Covered Property; or
> 4. A claim under this Coverage Part.

(Doc. 88-1 at 36.) UNIC argues that Christie's triggered this exclusion by submitting incomplete and inaccurate proofs of loss.

In the two proofs of loss it submitted on May 1, 2018, Christie's indicated that the covered property was occupied as a nightclub at the time of the break-ins and that it had not undergone any change in occupancy, use, or exposure. (*Id.* at 174, 177.) Those representations were false at the time they were made, and are at odds with Christie's position in this litigation that the property was unoccupied and under construction or renovation at the time of the break-ins. The statements were also material because they interfered with UNIC's ability to ascertain whether the property was vacant. (Doc. 94 at 9.) Significantly, however, UNIC has neither asserted nor identified evidence suggesting that Christie's misrepresentations were intentional, as is required to void coverage under the Policy. (*See* Doc. 88-1 at 36.) Conversely, Christie's has asserted that it attempted to respond to UNIC's request in good faith. (Doc. 93 at 17 n.4.) Awarding summary judgment on the basis of the concealment or misrepresentation provision would therefore be improper.

### c. Examination Under Oath

The Policy also includes an EUO provision, which provides that UNIC "may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim . . . ." (Doc. 88-1 at 31.) UNIC claims that Christie's breached this provision and the cooperation provision by refusing to sit for an EUO upon request. (Doc. 88 at 13.)

EUO provisions are common and have been included by insurers in insurance policies for years. *Allen v. Country Mut. Ins. Co.*, No. CV–13–01015–PHX–GMS, 2013 WL 6903748, at *3 (D. Ariz. Dec. 31, 2013). "[T]he law is well settled that a failure or refusal of the insured to comply with his obligation of cooperation under [an EUO] provision will constitute a bar to any recovery against the insurance company." *Warrilow v. Superior Court*, 142 Ariz. 250, 255 (Ariz. Ct. App. 1984). For the insured's failure to comply to act as such a bar, however, the insurer must have been "substantially prejudiced

thereby." *Clark Equip.*, 189 Ariz. at 441–42.

UNIC sent a letter to Christie's former attorney on September 5, 2017. (Doc. 88-2 at 27.) After inquiring whether the attorney was still pursuing the claim on Christie's behalf, the letter stated that "[i]f the claim is still being pursued, but your damages/incidents have not been supported, we would request that our insured sit for an examination under oath." (*Id.*) The letter then referenced certain Policy conditions and concluded by stating: "At this time we would ask you to submit the Proofs of Loss as requested 6 months ago, and we would likely also need to set up a time for an examination under oath." (*Id.* at 28.) Christie's responded to UNIC's letter eight months later, on May 1, 2018. (Doc. 88-1 at 172.) In its response, Christie's addressed only UNIC's request for proofs of loss, not its request for an EUO. (*Id.*) UNIC did not respond to Christie's letter. Ten months later, on March 5, 2019, Christie's sent UNIC a letter inquiring about the status of the claim. (Doc. 88-2 at 26.) UNIC responded that it never received Christie's letter. (Doc. 88-1 at 169.) Christie's re-sent the proofs of loss. (*Id.*) The following month, after the present action had been filed, UNIC again requested that Christie's sit for an examination under oath. (*Id.* at 154.) Christie's counsel responded that it would "work with [UNIC's] outside counsel to get the EUO scheduled and conducted." (*Id.*)

The parties disagree over whether the September 5, 2017, letter actually requested an EUO. Christie's argues that because the letter "use[d] conditional language," UNIC did not in fact request an EUO, but indicated only that it may request one in the future should it prove necessary. (Doc. 93 at 17 n.4.) Because "this request did not develop further," Christie's contends that its actions did not constitute a breach of the Policy. (*Id.*) In response, UNIC argues that Christie's reading is "disproven by the plain language of the letter and the sworn statements of United National's representatives who issued it." (Doc. 94 at 8.) The Court agrees with Christie's. The letter did not establish a time, date, or location for an EUO. Nor did it request that Christie's counsel do so. It used conditional, not definite, language. And UNIC did not follow up on its request until after the present action had been initiated, more than a year after the letter was sent. Had UNIC genuinely

believed that an EUO was necessary to clarify its coverage obligations, it should have been more diligent in pursuing its request. While UNIC asserts that it did not follow up on its EUO request until 2019 because it did not receive Christie's response to its September 5, 2017 letter until then, Christie's has produced evidence that it responded to UNIC's letter on May 1, 2018. Thus, according to Christie's, UNIC waited almost a year between receiving Christie's response and following up on its request for an EUO. Given these conflicting accounts, it would be inappropriate for the Court to grant summary judgment. The jury must determine which factual account reflects the truth.

Moreover, as mentioned above, UNIC must show that it was substantially prejudiced by Christie's refusal to sit for an EUO. Because substantial prejudice is generally a jury question, *Holt*, 157 Ariz. at 484, and because the parties present conflicting evidence on the issue, the Court declines to grant summary judgment on the basis of the EUO provision.

### d. Legal Action Against Us

Finally, the Policy includes a provision entitled "Legal Action Against Us." (Doc. 88 at 14.) This provision provides that Christie's may not bring a legal action against UNIC unless it fully complies with all the terms of the Commercial Property Conditions Coverage Part and the action is brought within two years of the date on which the loss or damage occurred. (Doc. 88-1 at 36.) UNIC asserts both that Christie's was not in compliance with the terms of the Commercial Property Coverage Part and that its suit was contractually barred because it was not brought within two years of the break-ins. Because the Court has already addressed Christie's compliance with the Policy conditions, it need not do so again here. Thus, the only question for the Court to decide is whether Christie's suit was precluded by the contractual limitations period. Christie's does not contend that the instant case was brought within the two-year limitations period. Therefore, unless the legal action provision is unenforceable, Christie's claims are barred, and summary judgment is appropriate.

Under Arizona law, the presumptive statute of limitations for a breach of written

1  contract is six years. A.R.S. § 12-548. Section 20-1115(A)(3), however, implicitly permits
2  property insurance policies to limit the time within which an action may be brought against
3  the insurer to one year from the date of occurrence of the event resulting in the loss. A.R.S.
4  § 20-1115(A)(3). Arizona courts will enforce such contractual limitations periods in
5  insurance policies unless: (1) the insurer "by its conduct induces its insured, by leading him
6  to reasonably believe a settlement or adjustment of his claim will be effected without the
7  necessity of bringing suit, to delay commencement of the action on the policy until after
8  the limitation period has run[;]" or (2) the insurer will not be prejudiced by the late filing
9  of the suit. *Zuckerman v. Transamerica Ins. Co.*, 133 Ariz. 139, 142–43, 147 (1982).

10  Christie's argues that both reasons for non-enforcement are applicable in this case.
11  It first contends that UNIC has waived or is estopped from asserting its rights under the
12  legal action provision because "[i]t is inconsistent for UNIC to claim it was conducting its
13  investigation in good faith for four years while requiring Plaintiffs to sue within two years
14  while they awaited resolution of their claim." (Doc. 93 at 17.) In its view, because UNIC
15  continued to investigate the claim and had yet to make its final coverage determination by
16  the end of the two-year limitations period, Christie's was induced to delay commencement
17  of the present action until after the limitations period had expired.

18  In Arizona, "an insurer's promise of payment or failure to deny liability until after
19  the limitation period has run may result in waiver or estoppel" if the plaintiff "reasonably
20  believed its insurance claims would be adjusted without the necessity of resorting to the
21  courts and thus reasonably delayed bringing suit until after the limitation period had
22  expired." *Shea North, Inc. v. Ohio Cas. Ins. Co.*, 115 Ariz. 296, 298 (Ariz. Ct. App. 1977);
23  *cf. Zuckerman*, 133 Ariz. at 141–42 (finding estoppel inappropriate where the insurer "had
24  taken a final position and had indicated no willingness to go beyond the offer which had
25  been extended"). But, where an insurer has clearly stated the limits of its liability and
26  "refuses to recognize any further liability," it is not estopped from enforcing its limitations
27  clause. *Zuckerman*, 133 Ariz. at 142.

28  Upon review of the record and construing the facts in the light most favorable to

Christie's, there is sufficient evidence for a reasonable jury to conclude that UNIC induced Christie's to delay commencing the present action. UNIC sent letters to Christie's monthly from December 2015 to August 2017 indicating that there had not yet been a settlement on Christie's claims and that UNIC's investigation was still ongoing. (Doc. 93 at 14–15.) UNIC issued a check for $16,389.56 to Christie's on February 9, 2016, but failed to provide an explanation as to what the check covered or whether it was rendered in partial or complete satisfaction of Christie's claims. (*Id.* at 15.) When it did finally respond to Christie's inquiries on September 21, 2016, UNIC indicated only that the check was an estimate for the first break-in—it neither disclaimed further liability for the first break-in nor denied coverage for the other break-ins. (Doc. 88-4 at 50.) On September 5, 2017, only a month before the two-year limitations period ended, UNIC requested that Christie's submit a proof of loss. (Doc. 88-2 at 27.) Christie's did so on May 1, 2018, but did not receive a response from UNIC until March 5, 2019. (Doc. 88-1 at 169.) UNIC cites no evidence in the record indicating that it either denied coverage or clearly stated the limits of its liability prior to the commencement of the present action. It is therefore not entitled to summary judgment on the basis of the legal action provision.

### B. Bad Faith

An insurer engages in bad faith when it intentionally and unreasonably denies a claim or when it intentionally and unreasonably fails to process, handle, or pay a claim. *Demetrulias v. Wal-Mart Stores, Inc.*, 917 F. Supp. 2d 993, 1004 (D. Ariz. 2013). Arizona's two-part test for bad faith consists of an objective and a subjective component. *Id.* Under the objective component, the Court asks whether the insurer acted unreasonably toward the insured. Under the subjective component, the Court asks whether the insurer acted knowingly or with reckless disregard as to the reasonableness of its actions. *Id.* (citing *Clearwater v. State Farm Mut. Auto. Ins. Co.*, 164 Ariz. 256, 260 (1990)).

Objectively unreasonable actions include the insurer's "failure to immediately conduct an adequate investigation, failure to act promptly in paying a legitimate claim, forc[ing] an insured to go through needless adversarial hoops to achieve its rights under

the policy, lowball[ing] claims, and similar conduct." *Id.* (quoting *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 238 (2000)). On the other hand, the insurer can reasonably challenge claims that are fairly debatable. *Zilisch*, 196 Ariz. at 237. Whether a claim is fairly debatable is ordinarily a question of fact to be determined by the jury. *Id.*

With respect to the subjective prong, the intent required "is an 'evil hand'—the intent to do the act. Mere negligence or inadvertence is not sufficient—the insurer must intend the act or omission . . . . But an 'evil mind' is not required; the insurer need not intend to harm the insured." *Rawlings v. Apodaca*, 151 Ariz. 149, 160 (1986). The insurer possesses the requisite intent when it lacks a "founded belief" that its conduct is permissible. *Id.* "The founded belief is absent when the insurer either knows that its position is groundless or when it fails to undertake an investigation adequate to determine whether its position is tenable." *Id.* At summary judgment, then, "[t]he appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Zilisch*, 196 Ariz. at 238.

In this case, there is sufficient evidence for reasonable jurors to conclude that UNIC acted unreasonably. Christie's has set forth evidence suggesting that UNIC denied or limited coverage based on an exclusion in an endorsement that was not in fact part of the Policy (Docs. 93 at 9, 12; 93-8 at 19);[3] failed to conduct a prompt and thorough investigation into Christie's claims (Doc. 93 at 11–14); tendered a lowball offer in the form of a $16,389.56 check in the hope that Christie's would settle the claim for less (Docs. 88-2 at 32–33; 88-9 at 28; 88-17 at 77; 88-62 at 21, 25; 93 at 15–16; 93-15 at 2); and repeatedly used form letters to "paper the file" and thereby delay resolution of Christie's claims (Docs. 88-17 at 10, 13, 16, 22, 25, 29, 32, 35, 38, 41, 44, 47, 50, 56, 59, 62, 65; 93 at 14–15).

---

[3] UNIC initially thought its liability on Christie's claim to be limited by an endorsement—referred to by the parties as the "Alloy Endorsement"—which purported to change the deductible and sublimit for certain metal-related damages. The endorsement, however, was apparently never an effective part of the Policy, having been added to the Policy five months after its inception without notice to Christie's. (Docs. 93 at 12; 93-13 at 5–6.)

While UNIC proffers contrary evidence suggesting that the delays and confusion were in fact caused by Christie's own actions, it is for the jury and not this Court to weigh the competing factual accounts. Christie's has introduced facts sufficient to create a genuine dispute. Summary judgment on Christie's bad faith claim would thus be improper.

UNIC argues that even if Christie's bad faith claim is not barred in its entirety, Christie's is nevertheless precluded from recovering emotional damages under that claim. The Court agrees. Because an insurance bad faith claim sounds in tort, rather than contract, a plaintiff may recover tort damages on that cause of action. *See Rawlings*, 151 Ariz. at 161. This ordinarily includes, *inter alia*, damages for emotional distress, humiliation, inconvenience, or anxiety. *Id.*; *see also* RAJI (Civil) Bad Faith 7 (7th ed. 2021). A corporate plaintiff, however, may not recovery emotional distress damages because "a corporation lacks the cognizant ability to experience emotions." *See HM Hotel Props. v. Peerless Indem. Ins. Co.*, 874 F. Supp. 2d 850, 854 (D. Ariz. 2012). The same is true of limited liability companies. *Id.* Christie's, a corporate entity, is therefore unable to recover emotional distress damages as a matter of law.

But because Christie's may nevertheless prevail on its bad faith claim by proving that it is entitled either to punitive damages or compensatory damages other than for emotional distress, summary judgment on its entire bad faith claim is not warranted.

### IV. CONCLUSION

Accordingly,

**IT IS ORDERED denying** Defendant's Motion for Summary Judgment (Doc. 88).

**IT IS FURTHER ORDERED** that, by separate order, the court will set a trial-setting conference in this matter.

Dated this 27th day of October, 2021.

Michael T. Liburdi
United States District Judge